FILED

2009 Aug-13  PM 12:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **MARJAN VAKILI and FAITH PROPERTIES, LLC,** ) ) ) | |
| **Plaintiffs,** ) ) | |
| **v.** ) | **Case No.: 2:08-CV-276-VEH** |
| ) | |
| **FIRST COMMERCIAL BANK; CHARLES F. STEPHENSON; BROOKESTONE PLACE, L.L.C.; PROVIDENCE PLACE L.L.C.;, and STUART M. MAPLES,** ) ) ) ) ) ) ) | |
| **Defendants.** ) ) ) | |
| **FIRST COMMERCIAL BANK OF HUNTSVILLE,** ) ) ) | |
| **Counter-claim and Third Party Plaintiff,** ) ) ) | |
| **v.** ) ) | |
| **MARJAN VAKILI AND FAITH PROPERTIES, LLC, as Counter-claim Defendants; and KEVIN VAKILI, as Third Party Defendant,** ) ) ) ) ) ) | |
| **Counter-claim and Third Party Defendants.** ) ) ) ) | |

## MEMORANDUM OPINION

## I.     INTRODUCTION

Before the Court are the following motions.[1]:

1.     Defendant Stuart M. Maples's Motion for Summary Judgment (Doc. 79);

2.     Plaintiff Marjan Vakili's Motion for Summary Judgment (Doc. 82);

3.     Defendant First Commercial Bank of Huntsville's Motion for Summary Judgment (Doc. 86);

4.     Defendants Charles F. Stephenson, Brookestone Place, LLC and Providence Place, LLC's Motion for Summary Judgment (Doc. 84);

5.     Defendants First Commercial Bank of Huntsville, Charles F. Stephenson, Brookestone Place, LLC, and Providence Place, LLC's Joint Motion to Supplement Evidentiary Submissions (Doc. 114); and

6.     Defendants First Commercial Bank of Huntsville, Charles F. Stephenson, Brookestone Place, LLC, and Providence Place, LLC's Joint Motion for Sanctions and Leave to Amend Their Counterclaims and Third Party Complaint (Doc. 116).

This case arises out of Defendants' attempt to collect on various debts owed

---

[1]  A hearing on all motions was held on July 27, 2009.

by Third Party Defendant Kevin Vakili.  Plaintiffs allege that the Defendants (in various combinations) violated Alabama law by attempting to foreclose on certain properties owned by Plaintiffs and Kevin Vakili and by attempting to collect on a default judgment entered against Kevin Vakili in Alabama state court. Defendants First Commercial Bank of Huntsville, Charles F. Stephenson, Brookestone Place, LLC, and Providence Place, LLC assert that Plaintiffs and Kevin Vakili fraudulently transferred certain assets in order to avoid Kevin Vakili's creditors.

For reasons discussed below, the Court finds that:

1.     Defendant Stuart M. Maples's Motion for Summary Judgment (Doc. 79) is due to be **GRANTED**;

2.     Plaintiff Marjan Vakili's  Motion for Summary Judgment (Doc. 82) is due to be **GRANTED**;

3.     Defendant First Commercial Bank of Huntsville's Motion for Summary Judgment (Doc. 86) is due to be **GRANTED IN PART AND DENIED IN PART**;

4.     Defendants Charles F. Stephenson, Brookestone Place, LLC, and Providence Place, LLC's Motion for Summary Judgment (Doc. 84) is due to be **GRANTED IN PART AND DENIED IN PART**;

5.      Defendants First Commercial Bank of Huntsville, Charles F. Stephenson, Brookestone Place, LLC, and Providence Place, LLC's Joint Motion to Supplement Evidentiary Submissions (Doc. 114) is due to be **GRANTED**; and[2,3]

6.      Defendants First Commercial Bank of Huntsville, Charles F. Stephenson, Brookestone Place, LLC, and Providence Place, LLC's Joint Motion for Sanctions and Leave to Amend Their Counterclaims and Third Party Complaint (Doc. 116) is due to be **GRANTED IN PART AND DENIED IN PART**.

## II.   STANDARD OF REVIEW[4]

---

[2]  The Court does not discuss this motion in a separate section.  The motion is due to be **GRANTED** because it was not opposed under the Court's scheduling order and, alternatively, the Court grants such motion on the merits because the movants obtained highly relevant evidence that had been part of a lengthy dispute chronicled in Docs. 96, 109, 111, days before filing their reply briefs.

[3]  Therefore the Court has considered the supplementary evidentiary submissions in its determination of the cross motions for summary judgment.

[4]   Although there are cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S.*, 224 F.2d 338, 345 (5th Cir. 1955); *Matter of Lanting*, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996).  The court will consider each motion independently, and in accordance with the Rule 56 standard.  *See Matsushita Elec. Indus. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." See Wright, Miller & Kane, Federal Practice and Procedure § 2720, at 327-28 (3d ed. 1998).

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).

The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(c) requires the nonmoving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)).  If the moving party bears the burden of proof at trial, then it can meet its burden on summary judgment only by presenting positive evidence that demonstrates the absence of a genuine issue of material fact; i.e., facts that would entitle it to a directed verdict if not controverted at trial.  *Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for a directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u>

show the absence of any evidence in the record in support of a judgment for the nonmoving party on the issue in question.  This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the court that there is an absence of evidence to support the nonmoving party's case.  *Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the nonmoving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *Lewis v. Casey*, 518 U.S. 343 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## III.   FACTUAL AND PROCEDURAL HISTORY[5]

### A.   Background

---

[5] These are the facts for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.'") (citation omitted).

Plaintiff Marjan Vakili is currently the president of KM International, Inc. ("KMI") and has a background in real estate.  (Doc. 84, AF[6] 2.)  Third Party Defendant Kevin Vakili is married to Marjan Vakili, has a Master of Business Administration degree and a doctorate in international business.  (Doc. 84, AF 1.) Currently, the couple resides in Irvine, California.  (Doc. 84, AF 54.)  Kevin Vakili is unemployed and Marjan Vakili is the sole owner of KMI, visiting the business at its headquarters in Tennessee approximately two times a year.  (Doc. 84, AF 55.)

In 2003, Kevin and Marjan Vakili established Plaintiff Faith Properties, LLC ("Faith Properties") for the purpose of holding real estate; they were the only members of the LLC.  (Doc. 84, AF 4.)  Kevin Vakili is no longer a member of Faith

---

[6]The designation "AF" stands for admitted fact and indicates a fact offered by the moving party that the non-movant has admitted in written submissions on summary judgment, or by virtue of any other evidence offered in support of the case.  Whenever the non-movant has adequately disputed a fact offered by the movant, the court has accepted the non-movant's version. In this case, all Plaintiffs and Defendants have filed motions for summary judgment. The court's numbering of admitted facts (e.g., AF 1), therefore, corresponds to the numbering of the movant's Statement of Facts as set forth in Docs.  80, 83, 85, and 87,  and responded to by the nonmovant in Docs. 91, 93, 95, and 97. To distinguish between admitted facts in Plaintiffs' motion for summary judgment, and Defendants' motions for summary judgment, the court also identifies the docket entry number that corresponds to the motion for summary judgment an admitted fact comes from (e.g., Doc. 85, AF 1).

A number following a decimal point corresponds to the particular sentence within the numbered statement of facts.  For example, (Doc. 85, AF 5.2) would indicate the second sentence of paragraph 5 of Defendants' Statement of Facts is the subject of the court's citation to the record. Similarly, the designation "AAF" stands for additional admitted fact and corresponds to the nonmovant's Statement of Facts contained in Docs. 91, 93, 95, and 97 and responded to by the movant in Docs. 106, 108, 112, and 115.  Any other facts referenced by the parties that require further clarification are dealt with later in the Court's opinion.

Properties because he, for no consideration, in December, 2005, transferred his interest in the business to his stepson, Sina Jashfar ("Jashfar"), a part-time student living in Naples, Florida.  (Doc. 84, AF 5.)

### B.   Kevin Vakili's Relationship with First Commercial Bank of Huntsville.

Defendant and Counterclaim/Cross Claim Plaintiff First Commercial Bank of Huntsville ("FCBH") is a bank located in Huntsville, Alabama, that conducts business in Madison County, Alabama.  (Doc. 87, AF 1.)  FCBH had a banking relationship with two companies owned by third-party defendant Kevin Vakili, KM International, Inc. ("KMI") and Volunteer Plastics Recycling, Inc. ("VPR").  (Doc. 87, AF 3.)  FCBH extended a revolving line of credit to KMI and VPR (the "KMI and VPR Loans") in 2002 or 2003 and renewed the KMI and VPR Loans for several years before the events giving rise to this lawsuit.  (Docs. 87, AF 4; 88, Smyser Aff. at ¶ 4.) The KMI and VPR Loans were secured by a security interest in KMI and VPR's accounts receivable and inventory as well as by a personal guaranty executed by Kevin Vakili, assuring payment of all obligations under the KMI and VPR Loans. (Doc. 87, AF 5-6.)

Kevin Vakili's relationship with FCBH changed in the fourth quarter of 2004 and in the first quarter of 2005 when FCBH determined that, because Kevin Vakili

had relocated KMI and VPR to Kenton, Tennessee, KMI and VPR should move their banking business to another location as well. (Docs. 87, AF 7; 88, Smyser Aff at ¶ 6.) FCBH began extending the KMI and VPR Loans on a three month basis instead of an annual basis. (Doc. 87, AF 7; Smyser Aff. at ¶ 6.) The shorter term renewals of the KMI and VPR Loans provided for monthly interest-only payments, with the principal due on demand or on the maturity date of the notes. (Doc. 87, AF 8.)

In the months following the change in their banking relationship, Kevin Vakili continued to request additional extensions of the KMI and VPR Loans; FCBH provided extensions to the KMI and VPR Loans, but it requested additional collateral from KMI and VPR due to the deterioration of the value of their accounts receivable. (Docs. 88, AF 9; 88, Smyser Aff. at ¶ 8.) Representatives of FCBH went to Tennessee to meet with Kevin Vakili to obtain additional collateral, but he did not comply with their requests. (Doc. 84, AF 12.)

By the summer of 2005, KMI and VPR owed aggregate principal in the amount of $600,000. (Doc. 87, AF 9.) Further, the value of the collateral securing the KMI and VPR Loans was worth far less than the outstanding principal amounts. (Doc. 87, AF 10.)

In his negotiations to extend the KMI and VPR Loans in 2005, Kevin Vakili submitted a personal financial statement to FCBH on April 20, 2005. (Doc. 87, AF

11.)  In this submission, Kevin Vakili stated that he was the sole owner of certain real estate, which included (1) 3 Red Maple Lane, Huntsville, Alabama (the "Ledges Residence"); (2) 608 Dement Street, Huntsville, Alabama (the "Dement Property" or "Tract 2") (3) 602 O'Shaughnessy, Huntsville, Alabama (the "O'Shaughnessy Property" or "Tract 3"); and (4) 601 McCullough, Huntsville, Alabama (the "McCullough Property" or "Tract 1") (collective, the McCullough, Dement and O'Shoughnessy Properties constitute the "Huntsville Properties"). (Doc. 87, AF 11.) In addition to representing that he was the sole owner of the Ledges Residence and the Huntsville Properties, Kevin Vakili also asserted that he was the sole owner of Faith Properties, LLC.  (Doc. 87, AF 12.)

In the course of negotiations to extend the KMI and VPR Loans, Kevin Vakili informed FCBH that his business was not doing very well and that he was not in a position to provide additional collateral for the KMI and VPR Loans.  (Doc. 87, AF 13.)  Subsequently, on September 22, 2005, the KMI and VPR Loans matured and their entire balances were due.  (Doc. 87, AF 14.)  Kevin Vakili did not pay off the KMI and VPR Loans and they consequently were in default.  (Doc. 87, AF 14.)

In order to assist in the collection of the debts owed by KMI and VPR, and guaranteed by Kevin Vakili, FCBH retained an attorney, William J. Gibbons ("Gibbons"), who had frequently represented FCBH and other Huntsville area banks

in other legal matters in the past.  (Doc. 87, AF 15.)  However, FCBH never received any payment from KMI or VPR, as they filed for bankruptcy days before FCBH instituted a state court action to collect on the debt, nor did it receive any payments from Kevin Vakili under the personal guaranty.  (Doc. 87, AF 16.)

### C.   Alabama State Court Action

On October 19, 2005, FCBH initiated an action against KMI, VPR, and Kevin Vakili in the Circuit Court of Madison County, Alabama (the "State Court Action") in order to collect the balance owed on the KMI and VPR Loans.  (Doc. 87, AF 17.) On December 14, 2005, FCBH obtained a default judgment against Kevin Vakili in the State Court Action as a consequence of his failure to appear, respond, and defend (the "Default Judgment").   (Doc. 87, AF 18.)   In total, the Default Judgment amounted to $705,710.01.  (Doc. 84, AF 21.)

After the Default Judgment was entered on December 14, 2005, FCBH learned that Kevin Vakili and his wife, Plaintiff Marjan Vakili, sold the Ledges Residence on November 29, 2005, and were in the process of disposing of the cash proceeds.  (Doc. 87, AF 19.)  Thus, on December 16, 2005, FCBH obtained a temporary restraining order (TRO) in the State Court Action, preventing Kevin Vakili from transferring or otherwise disposing of any proceeds he received from the sale of property that he owned in Huntsville, Alabama.  (Doc. 87, AF 19.)  The TRO was subsequently

converted into a preliminary injunction.  (Doc. 87, AF 19.)

Then, in violation of the TRO and the preliminary injunction, Kevin Vakili deposited the remaining proceeds of the sale of the Ledges Residence (having satisfied the outstanding mortgages on that property) into Marjan Vakili's bank account at AmSouth Bank and he subsequently directed Marjan Vakili to pay some of his other debts out of this AmSouth Bank account.  (Doc. 87, AF 20.)  None of the proceeds were paid to the Clerk of Court for the Circuit Court of Madison County, Alabama.   (Doc.87, AF 20.)

Subsequently, on March 20, 2005, Gibbons served a subpoena on AmSouth Bank, seeking records pertaining to Marjan Vakili's account (the "AmSouth Subpoena").  (Doc. 88, State Court Action at 140.)  Marjan Vakili claims that the AmSouth Subpoena invaded her privacy, constituted an abuse of process, and amounted to the tort of outrage.  (Doc. 89, Marjan Vakili Dep. at 184-189.)  Gibbons issued the AmSouth Subpoena to find out where the money from the sale of the Ledges Residence went because Kevin Vakili had promised the money to FCBH. (Doc. 87, AF 22.)

Gibbons sent a letter to Kevin Vakili's attorney stating that FCBH was about to begin executing on the judgment in the State Court Action judicially foreclosing on the Huntsville Properties.  (Doc. 87, AF 22.)  As early as April 20, 2005, Kevin

Vakili had represented to FCBH that he owned the Huntsville Properties personally;

he never represented that he had transferred the Huntsville Properties.  (Doc. 87, AF

22.)

Shortly before entry of the Default Judgment, on November 30, 2005, Kevin

Vakili sent an email to his attorney stating:

> I would like to transfer or change [the Huntsville Properties] to our
> property management company called "Faith Properties" . . . . I basically
> [would] like to get these two properties out of my personal name and
> deed it or title it under the company name.  Please ask Gig if it is a good
> idea to do so.  I am just trying to cover myself for [sic] any kinds of
> exposure.  Faith Properties is owned by my wife and me.  Is it better to
> transfer all to her name or keep it under this company?

(Doc. 114, Ex. N.)

On December 9, 2005, Kevin Vakili followed up with his attorney on his prior

request and, in this email, he indicated that he wanted to transfer all of his shares in

Faith Properties to his stepson (Marjan Vakilli's son), Sina Jashfar.  In the email,

Vakili explained:

> Any more progress on the property transfers from my name to Faith
> Properties? . . . My main concern is to transfer these properties from my
> personal name to Faith Properties as soon as possible.  At the same time,
> I would like to transfer my shares 50% in Faith Properties to my Step
> Son: Mr. Sina Jashfar . . . . Can we do this real soon?

(Doc. 114, Ex. O.)

Two days after entry of the Default Judgment, on December 16, 2005, Kevin

14

Vakili recorded three deeds reflecting the transfer of the Huntsville Properties to Plaintiff Faith Properties, LLC ("Faith Properties") (the "Transfer").  (Doc. 87, AF 23.1.)  Kevin Vakili testified in his deposition taken in this case on January 14, 2009, that Faith Properties was owned in 2004 by Marjan Vakili and Jashfar.  (Doc. 87, AF 23.2; Doc. 89, K. Vakili Dep. at 132:19-133:5.)  However, as of December 17, 2005, Kevin Vakili was still arranging the transfer of his interest in Faith Properties to Jashfar.  (*See* Doc. 114, Ex. P.)  The Vakilis also produced documents during discovery in this case that they argue indicate that the transfer of Kevin Vakili's interest in Faith Properties occurred in October, 2004.  (*See* Doc. 116, Ex. A.) However, as described in Kevin Vakili's emails, as of December, 2005, Kevin Vakili still owned his shares in Faith Properties.  (*See* Doc. 114, Exs. N-P.)

After the transfers by Kevin Vakili of his interest in the Huntsville Properties into Faith Properties and by Kevin Vakili of his interest in Faith Properties to Sina Jashfar, Kevin Vakili no longer had any significant assets in his name; however, he remained active in the daily operations of Faith Properties.  (Doc. 87, AF 23.4.)

According to Kevin and Marjan Vakili, they intended to transfer (and believed they had transferred) the Huntsville Properties to Faith Properties prior to 2005. (Doc. 89, K. Vakili Dep. at 41:12-42:2.)   They testified that they hired an attorney

in order to effectuate the transfer. (*Id.*)[7] Kevin and Marjan Vakili intended to transfer the Huntsville Properties in 2003 for tax purposes, upon the advice of their accountant. (Doc. 89, K. Vakili Dep. at 45:3-14.) In his deposition, Kevin Vakili stated:

> We signed everything–as far as we were concerned, we did everything according to the boundaries of law and whatever we had to do with our attorney that we hired to do [the 2003 transfer]. All this [sic] transfers, all this companies [sic] for us back in 2003, and we signed whatever documents we had to sign . . . .

(Doc. 89, K. Vakili Dep. at 137: 1-8.)

Plaintiffs also argue that Faith Properties paid all taxes on the Huntsville Properties in 2003 and 2004 and that this shows Kevin and Marjan Vakili's intent to transfer the Huntsville Properties to Faith Properties in 2003. (Doc. 99 at 13-14, 16.) In support of this argument, they refer the Court to the unsigned tax returns of Faith Properties for 2003, 2004, and 2005.

The 2003 return, prepared in March, 2004, lists Kevin Vakili as the "Tax Matters Partner," shows no properties owned other than real estate in Sharon, Tennessee, and shows $2,292 in taxes paid. Kevin and Marjan Vakili are each listed as 50% owners on the 2003 return. Both the 2004 and 2005 returns were prepared

---

[7] However, it is undisputed that there are no documents in that attorney's client file that corroborate their testimony.

in March, 2006.  The 2004 return shows Kevin Vakili as the "Tax Matters Partner," lists two "Commercial Building[s]" in Huntsville, Alabama (one of which is described as "Dement St.") as property of Faith Properties, LLC, and lists Kevin Vakili and Marjan Vakili each as owning 50% of profits, loss, and capital.  The 2004 return reflects no deduction for taxes paid in 2004 (Form 8825, item 9(1); Form 1065, item 14).  The 2005 return shows Marjan Vakili as the "Tax Matters Partner," lists the same properties, and shows taxes paid in 2005 totaling $5,764 for the two properties located in Huntsville, Alabama.  The 2005 return lists Sina Jashfar as owning 40% of Faith Properties and Marjan Vakili as owning 60%.  (*See* Docs. 116, Ex. A; 89 Exs. 2, 4, 5 to Ex. I.)  Thus, the 2003 and 2004 returns contradict the Vakili's claim that Faith Properties paid taxes on the Huntsville Properties in those years.  The 2005 return does not indicate when in 2005 (that is, before or after the Transfer?) Faith Properties paid taxes on any of the Huntsville Properties.

Kevin and Marjan Vakili conferred with Colonial Bank prior to attempting to transfer the Huntsville Properties to Faith Properties.  (Doc. 89, K. Vakili Dep. at 134:20-135:13.)  In late 2005, Kevin Vakili was informed that deeds reflecting the intended transfer in 2003 had not been recorded, and he retained an attorney, Y. Albert Moore, III, to prepare and record the necessary deeds.  (Doc. 89, K. Vakili Dep. at 227:21-229:23.)

Following Kevin Vakili's transfer of the Huntsville Properties to Faith Properties, FCBH filed a claim against Marjan Vakili and Faith Properties for fraudulent conveyance as part of what FCBH considered to be intertwined with the State Court Action.  (Doc. 87, AF 24.)  FCBH filed a motion for summary judgment on February 2, 2007, and the Circuit Court granted the motion on March 28, 2007, holding that the December 16, 2005, transfers of the Huntsville Properties by Kevin Vakili were indeed fraudulent.  (Doc. 87, AF 24.)  However, the Supreme Court of Alabama vacated that judgment on the ground that the Circuit Court lacked jurisdiction over the matter because Kevin Vakili had not appealed the March 3, 2006, order refusing to set aside the default judgment entered against him.  (Doc. 87, AF 24.)

### D.    Kevin Vakili's Bankruptcy

On March 5, 2005, in an email to his accountant, two days after the Circuit Court declined to set aside the default judgment in the State Court action, Kevin Vakili wrote to his attorney as follows:

> Thank you very much for getting things done quickly.  Just to keep you updated, the Huntsville court did not rule for me to set aside the judgment entered by FCB.  At this point, they have got judgments against all of my properties that are in my name personally.  This includes the 601 McCullough and probably half of the restaurant [the Huntsville Properties].  I am basically waiting for my attorney to give me instructions of what needs to be done next.

· · ·

> It is getting really messy with the Bank and at the same time I am becoming more rebellious with them.  I believe I am still going forward with the law suit against them, but I do not know this yet.  If they do not settle with me reasonably, I might end up filing for Chapter 13 personally in order to give them as much hard time to collect money and prolong this as long as I can.  At the same time, maybe I can still keep the properties.  I do not know what to do at this point.  I am kind of confused and lost among all of these law suits and legal works.

(Doc. 87, AF 25.)

Subsequently, Kevin Vakili filed for Chapter 13 bankruptcy in the United States Bankruptcy Court for the Western District of Tennessee (the "Bankruptcy Case").  (Doc. 87, AF 26.)  As part of the proceedings, the Trustee filed a Motion to Convert the Bankruptcy Case into a Chapter 7 petition on the basis that Kevin Vakili had caused delays that had been prejudicial to his creditors by failing to file accurate petitions, schedules, and statements of financial affairs.   (Doc. 87, AF 26.)  Additionally, the Trustee filed a Complaint to Avoid Transfers, seeking to avoid payment of certain proceeds paid from the sale fo the Ledges Residence and the transfer of the Huntsville Properties.  (Doc. 87, AF 26.)  However, the Bankruptcy Case was voluntarily dismissed on March 30, 2007, after the Trustee withdrew the Motion to Convert and prior to resolution of the Complaint to Avoid Transfers. (Doc. 87, AF 27.)

### E.    Colonial Bank's Notes and Mortgages

Colonial Bank held three notes secured by mortgages on the Huntsville Properties (the "Colonial Notes") and, as a result, had a first priority position as to the Huntsville Properties.  (Doc. 87, AF 28.)  The first note was signed in 1998 by Kevin and Marjan Vakili and applied to all three of the Huntsville Properties.  (Doc. 80, Ex. A to Ex. 1.)  Specifically, the lots were described as three separate tracts ("Tract 1", "Tract 2", and "Tract 3").  (*Id.*)  The 1998 note further provided that, in the event that the Vakilis failed to make any payments, the holder of the note was entitled to conduct a foreclosure sale and auction the Huntsville Properties to the highest bidder, "for cash."  (*Id..*)  The second note was signed by Marjan and Kevin Vakili in 1999 and it contained identical provisions to the first note.  However, the second note only applied to Tract 2 and Tract 3.  (*Id.*)  The third note, signed in October, 2003, was signed only by Kevin Vakili and applied only to Tract 1.  (*Id.*)  The 2003 note, however, did not contain identical terms to the first two notes.  (*Id.*)  The 2003 note provided that, in the event of default, a foreclosure sale could be held "*en masse*."[8] (*Id.*)  None of the other notes specify whether any foreclosure sale should proceed on a parcel by parcel basis, or *en masse*.  (*Id.*)

### F.     Brookestone's Acquisition of the Huntsville Properties

---

[8]  The term *en masse*, as used in this third note, technically does not make sense because there was only one parcel subject to the note. An *en masse* foreclosure necessarily implicates more than one parcel of land.

Noticing a "for sale" sign in front of Tract 1 (also known as the McCullough Property), Defendant and Counterclaim/Cross Claim Plaintiff Charles Stephenson ("Stephenson") developed an interest in purchasing the property.  (Doc. 87, AF 29.) Stephenson, who had no relationship with FCBH, hired an attorney, Defendant Stuart M. Maples ("Maples"), to help him acquire the property.  (Doc. 87, AF 29-30.) Maples ordered a title examination of the McCullough Property and the title work revealed the Colonial Notes and the notice of FCBH's *lis pendens*; additionally, Maples reviewed the pleadings from the bankruptcy proceedings involving KMI, VPR, and Kevin Vakili.  (Doc. 87, AF 31.)  Maples contacted Gibbons, who had performed work for Colonial Bank in the past and Gibbons "facilitated" Stephenson's purchase of the Colonial Notes by helping to contact the appropriate employee of Colonial Bank.  (Doc. 87, AF 32.)  However, at least one Colonial Bank Employee testified that Gibbons represented Colonial Bank in the matter.  (Doc. 89, Lewis Dep. at 89:104:14-19.)  No employee or officer of FCBH ever had any contact with Colonial Bank about the purchase of the Colonial Notes.  (Doc. 87, AF 33.)

On October 4, 2005, Colonial Bank assigned the Colonial Notes to Defendant and Counterclaim/Cross Claim Plaintiff Brookestone Place, LLC ("Brookestone"), a company owned and controlled by Stephenson.  (Doc. 87, AF 34.)  All of the Colonial Notes included cross-default and cross-collateralization provisions, in

addition to a due on sale clause.  (Doc. 84, AF 37.)  The cross-collateralization clause also specified that the mortgages secured all debts between Kevin Vakili and Colonial Bank.  (Doc. 84, AF 37.)  Marjan Vakili also signed one of the cross-collateralized notes.  (Doc. 84, AF 38.)

### G.   FCBH's Partial Assignment of the Vakili Judgment

Maples thought it necessary to reach an agreement between FCBH and Stephenson regarding FCBH's judgment in the State Court Action because he was concerned about what FCBH might do as a potential bidder on the Huntsville Properties. (Doc. 87, AF 35.)   Similarly, Gibbons had concerns about protecting FCBH's interest in the Huntsville Properties through the Default Judgment and the then-pending fraudulent conveyance action in Alabama state court. (Doc. 87, AF 36.)  Near the end of 2006, Gibbons, FCBH, Maples, and Stephenson met to discuss Stephenson's purchase of the Vakili Judgment but the meeting ended quickly because Stephenson offered a purchase price that FCBH believed to be too low.  (Doc. 87, AF 36.) Following subsequent negotiations over the phone, the parties met again in March, 2007, and Stephenson and FCBH finally agreed to a purchase price.  (Doc. 87, AF 37.)   Ultimately, Stephenson agreed to purchase a portion of FCBH's judgment for $245,000.  (Doc. 87, AF 37.) FCBH retained a portion of the judgment in hopes of receiving a distribution in the then-pending Bankruptcy Case, and it

retained the right to continue to pursue its fraudulent conveyance claim against Kevin Vakili in Alabama state court.  (Doc. 87, AF 37.)

**H.      Foreclosure on the Huntsville Properties**

Maples knew that the Colonial Notes were in default prior to the time that Stephenson purchased them.  (Doc. 80, Maples Aff. at ¶ 4.)  Kevin Vakili had failed to inform Colonial Bank of his bankruptcy petition; his bankruptcy petition amounted to a default according to the terms of the Colonial Notes.  (Doc. 85, AF 40.)

On October 23, 2006, Stephenson sent a notice to Faith Properties, notifying it of the default and/or maturity of the Colonial Notes, accelerating the debt, and demanding payment.  (Doc. 85, AF 41.)  Neither Faith Properties, Marjan Vakili, nor Kevin Vakili made payment on the Colonial Notes, now held by Brookestone.  (Doc. 85, AF 42.)  Brookestone then filed a motion in Kevin Vakili's bankruptcy case, requesting permission to proceed with the foreclosure of the Huntsville Properties. (Doc. 85, AF 43.)  That motion was granted by the bankruptcy court on January 5, 2007.  (Doc. 85, AF 43.)

On March 2, 2007, Maples sent Faith Properties, Kevin Vakili, and Marjan Vakili a Notice of Foreclosure Sale to be held on March 23, 2007, separately with respect to each of the Colonial Notes (the "Notices").  (Doc. 85, AF 45; Doc. 80, Ex. H.)  The foreclosure notices were published for a three-week period and neither

Kevin Vakili, Marjan Vakili, nor Faith Properties objected to the foreclosure. (Doc. 85, AF 46.) Each of the Notices specified that the foreclosure sale would proceed "at public outcry to the highest bidder for cash." (Doc. 80, Ex. H.)

Maples conducted a foreclosure sale on behalf of Brookestone on March 30, 2007. (Doc. 80, AF 40.) He conducted the foreclosure sale, as auctioneer, on the steps of the Madison County Courthouse in Huntsville, Alabama. (Doc. 80, AF 13.) Maples also was acting as "attorney-in-fact" for Marjan Vakili at the foreclosure sale. (Doc. 80, Ex. M.) In addition to representing Brookestone and Marjan Vakili, Maples also represented Providence at the sale. (Doc. 80, Maples Aff. at ¶ 16.)

Marjan Vakili and her attorney were present at the sale. (Doc. 85, AF 48.) Marjan Vakili brought $300,000 with her that she intended to use to bid on the Huntsville Properties, but she did not make a bid during the sale. (Doc. 85, AF 48.) The properties were sold *en masse*, pursuant to the third of the Colonial Notes (signed by Kevin Vakili alone, and not signed by Marjan Vakili, in 2003). (Doc. 88, Ex. G at ¶ 18 ("In the event of default . . . [a]ny such sale [of the property] may, at the option of the Lender, be made *en masse*.")) Defendant Providence Place, LLC ("Providence"), a company owned by Stephenson and his wife, purchased the Huntsville Properties at the foreclosure sale. (Doc. 87, AF 40.) The total bid on the Huntsville Properties was $643,685.00. (Doc. 87, AF 40.) The amount of the bid

was sufficient to satisfy the Colonial Notes without deficiency.  (Doc. 85, AF 51.) This amount included the Colonial Bank Mortgages, the partial judgment from FCBH owned by Stephenson, and the foreclosure expenses.  (Doc. 80, AF 16.)

Maples also announced at the foreclosure sale that the purchase price of the Huntsville Properties would be allocated among the three properties at the sole discretion of the mortgage holders.  (Doc. 80, AF 16.)  Following Providence's purchase of the Huntsville Properties at the auction, Marjan Vakili's attorney, Jeff Brumlow ("Brumlow"), asked how the overpayment was going to be distributed after the allocation.  Maples responded that there was no overpayment based on the allocation of the Colonial Notes.  (*Id.*)

FCBH and Gibbons did not attend or otherwise participate in the foreclosure sale on the Huntsville Properties.  (Doc. 87, AF 41.)  Maples did not receive any proceeds from the sale, never held any moneys from the sale, and he never distributed any of the monies from the sale.  (Doc. 80, AF 19.)

Plaintiffs, Marjan Vakili and Faith Properties, filed the current lawsuit on February 14, 2008. (Doc. 1.)  The jurisdiction of this Court was invoked pursuant to 28 U.S.C. § 1332.  Plaintiffs' Amended Complaint (Doc. 13) was brought solely under Alabama law.  It contained twelve counts: accounting (Count I), breach of fiduciary care (Count II), conspiracy (Count III), money had and received (Count IV),

wrongful foreclosure (Count V), conversion (Count VI), trespass (Count VII), interference with contractual or business relations (Count VIII), abuse of process (Counts IX-X), invasion of privacy (Count XI), and outrage (Count XII).  On March 24, 2008, FCBH filed a Counterclaim and Third Party Complaint against Plaintiffs and Kevin Vakili.  (Doc. 26, *as amended by* 30.)  FCBH's Counterclaim and Third Party Complaint also was based solely on alleged violations of Alabama law, specifically that Plaintiffs and Kevin Vakili engaged in a fraudulent transfer (Counts I-III) and that FCBH was entitled to common law indemnity from Kevin Vakili (Count IV).   Stephenson, Brookestone, and Providence (the "Stephenson Defendants") filed a cross claim/counterclaim against Plaintiffs and Kevin Vakili on April 21, 2008.  (Doc. 41, *as amended by* 64.)   The Stephenson Defendants' Counterclaim/Cross Claim levied the same charges as FCBH's Counterclaim and Third Party Complaint and added a claim for setoff and recoupment. (*Id.*)

Maples filed a Motion for Summary Judgment (Doc. 79), seeking entry of judgment as to all claims brought against him.  In her Motion for Summary Judgment (Doc. 82), Marjan Vakili seeks entry of judgment as to all counterclaims brought against her.  Both the Stephenson Defendants and FCBH filed separate motions for summary judgment (Docs. 82, 84), seeking entry of judgment in their favor as to all their Counterclaims/Cross Claims against Plaintiffs and Kevin Vakili, and also as to

all of Plaintiffs' claims levied against them.  The Court now takes the pending motions under submission.

## IV.   ANALYSIS

The Court's ruling on FCBH's and the Stephenson Defendants' Counterclaims/Cross Claims determines the outcome of several of Plaintiffs' claims. Therefore, the Court will first address the pending motions insofar as they relate to FCBH's and the Stephenson Defendants' Counterclaims/Cross Claims before turning to Plaintiffs' claims.

### A.   The Counterclaims/Cross Claims against Plaintiffs and Kevin Vakili[9]

Both FCBH and the Stephenson Defendants have argued in their motions for summary judgment that they are entitled to prevail on their counterclaims/cross-claims against Plaintiffs and Kevin Vakili.  Marjan Vakili has also filed a motion for summary judgment, seeking her dismissal as a party to the counterclaims/cross claims.  The Stephenson Defendants' counterclaims/cross-claims are for fraudulent transfer through actual fraud (Count I), constructive fraud (Count II), and insolvency (Count III), as well as claims for common law indemnity (Count IV) and for setoff

---

[9]  FCBH and the Stephenson Defendants have sought to amend their counterclaims/cross claims as part of their motion for sanctions. (Doc. 116.)  The Court will address that motion in a separate Order.

and recoupment (Count V). (Doc. 64.)  FCBH's counterclaims/cross claims consist of claims for fraudulent transfer through actual fraud (Count I), constructive fraud (Count II), and insolvency (Count III), as well as a claim for indemnity (Count IV). (Doc. 30.)

### 1.  Marjan Vakili's Motion for Summary Judgment

At the Court's hearing held on July 27, 2009, both FCBH and the Stephenson Defendants conceded that their currently pending counterclaims against Marjan Vakili are due to be dismissed.  Accordingly, Marjan Vakili's motion for summary judgment is due to be **GRANTED** as unopposed.

### 2.  FCBH's Counterclaims/Cross Claims

#### i.  Constructive Fraud

FCBH first argues that the December 16, 2005, Transfer of the Huntsville Properties constitutes constructive fraud under the AUFTA, Ala. Code § 8-9A-5(a) and Ala. Code § 8-9A-4(c)(2)[10].  Under § 8-9A-5-(a), "[a] transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if [1] the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and [2] the debtor was insolvent at that time or the debtor became

---

[10]  FCBH did not discuss Ala. Code § 8-9A-4(c)(2) in their brief (*see* Doc. 87 at 16-17), but they did raise it at the hearing held on July 27, 2009.

insolvent as a result of the transfer." ) Under § 8-9A-4(c), "[a] transfer made by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor . . . [2] [i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due."  Thus, the first element of a § 8-9A-4(c)(2) claim is identical to a § 8-9A-5(a) claim. However, the Court will analyze each constructive fraud claim separately.

### a.  Insolvency--§ 8-9A-5(a)

In *In re Advanced Telecommunication Network, Inc.*, 490 F.3d 1325 (11th Cir. 2007), the court explained in detail the concept of "reasonably equivalent value" as part of the uniform fraudulent transfer act:

> By its terms and application, the concept of "reasonably equivalent value" does not demand a precise dollar-for-dollar exchange. *In re Perry County Foods, Inc.*, 313 B.R. 875, 895 (Bankr. N.D. Ala.2004) (citing *Butler Aviation Int'l, Inc. v. Whyte (Matter of Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1125-26 (5th Cir.1993)). The benefit received need not be entirely "direct," and courts have occasionally upheld as "reasonably equivalent value" the cessation of shareholder disputes. *Schaps v. Just Enough Corporation (In re Pinto Trucking Service, Inc.)*, 93 B.R. 379, 389-90 (Bankr. E.D. Penn.1988) (finding reasonable value where company transferred $500,000 to fighting shareholders and forgave shareholder loans totaling $600,000). Nevertheless, courts are to scrutinize the value of transfers much more closely in [situations involving] transfers to insiders. *See General Electric Capital Auto Lease, Inc. v. Broach (In re Lucas Dallas, Inc.)*, 185 B.R. 801 (9th Cir. 1995).

*Id.* at 1337.  Additionally,

The value of consideration given for a transfer alleged to be fraudulent is determined from the standpoint of the debtor's creditors. *See In re Hinsley*, 201 F.3d at 643-44 (applying the TUFTA); *In re Viscount Air Servs.*, 232 B.R. at 434 (interpreting the Arizona Uniform Fraudulent Transfer Act). "The proper focus is on the net effect of the transfers on the debtor's estate, the funds available to the unsecured creditors." *In re Hinsley*, 201 F.3d at 644 (quoting *In re Viscount Air Servs.*, 232 B.R. at 435); *In re Jeffrey Bigelow Design Group, Inc.*, 956 F.2d 479, 484 (4th Cir.1992) ("As long as the unsecured creditors are no worse off because the debtor, and consequently the estate, has received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred."). Value is determined as of the transfer date. *Leibowitz v. Parkway Bank & Trust Co.*, 210 B.R. 298, 301-02 (N.D.Ill.1997); *Mladenka v. Mladenka*, 130 S.W.3d 397, 407 (Tex.App.-Houston [14 Dist.] 2004, no pet.). Courts generally compare the value of the property transferred with the value of the property received in exchange for the transfer. *In re Sullivan*, 161 B.R. 776, 781 (Bankr. N.D. Tex.1993).

*Smith v. American Founders Financial, Corp.*, 365 B.R. 647, 667 (Bankr. S.D.Tex.2007).

Plaintiffs and Kevin Vakili claim that a "reasonably equivalent value" was exchanged for the Huntsville Properties because Faith Properties paid the monthly mortgage payments on the Huntsville Properties following the "intended" transfer in 2003.  (Doc. 98 at 10.)  Even assuming that there was such an intent to transfer, this argument is unavailing because the relevant transfer for the Court's analysis is the transfer that was recorded on December 16, 2005.   "A transfer [of real property is made] when the transfer is so far perfected that a good-faith purchaser of the asset

from the debtor against whom applicable law permits the transfer to be perfected cannot acquire an interest in the asset that is superior to the interest of the transferee." Ala. Code § 8-9A-6(1).  In Alabama, a transfer of real property is perfected when the conveyance is recorded.  Ala. Code § 35-4-90 ("All conveyances of real property, deeds, mortgages, deeds of trust or instruments in the nature of mortgages to secure any debts are inoperative and void as to purchasers for a valuable consideration, mortgagees and judgment creditors without notice, unless the same have been recorded before the accrual of the right of such purchasers, mortgagees or judgment creditors.").  Intent is not an element of FCBH's § 8-9A-5(a) fraudulent transfer claim and what Kevin Vakili intended to do, but did not record, in 2003 is not relevant to that claim.

Further, the fact that Faith Properties made payments on the Colonial Notes is unrelated to whether Kevin and Marjan Vakili received reasonably equivalent value. As explained in *Smith*, under the UFTA, the value of consideration is determined from the perspective of the debtor's <u>creditors</u>.  It is undisputed that Kevin Vakili's estate was substantially diminished by his Transfer of the Huntsville Properties. Consequently, in collecting on the <u>Default Judgment</u> (not the Colonial Notes), FCBH was made worse off by the Transfer.  Finally, the payments made did not satisfy the debt evidenced by the Colonial Notes.  Rather, the payments merely kept the Colonial

31

Notes current.  Thus, the Court finds that the Transfer was not for reasonably equivalent value.

Turning to the second element of FCBH's § 8-9A-5(a) claim, it is undisputed that the Transfer made Kevin Vakili insolvent.  After the Transfer was completed, Kevin Vakili had few assets to his name.  (Doc. 89, Vakili Dep. at 259:21-260:19.) Indeed, shortly thereafter, he filed for bankruptcy.  (*See* Doc. 27, AF 26.)  Therefore, the Court finds that the second element of FCBH's § 8-9A-5(a) fraudulent transfer claim for constructive fraud is satisfied and that summary judgment is due to be **GRANTED** in favor of FCBH as to this claim.[11]

> b.  Intent to Incur Debts Beyond Ability to Pay--§ 8-9A-4(c)(2)

The Court has already determined *supra* that Kevin Vakili and Faith Properties did not receive adequate consideration for the Transfer.  Thus, the first element of the § 8-9A-4(c)(2) claim is satisfied.  However, concerning the second element of the § 8-9A-4(c)(2) claim, FCBH has provided no evidence that Kevin Vakili and Faith Properties "[i]ntended to incur . . . debts beyond his or her ability to pay as they became due."  Therefore, summary judgment is due to be **DENIED** as to FCBH's

---

[11]  In addition to Kevin Vakili, judgment will be entered against Faith Properties on this claim because Faith Properties was the first transferee of the Huntsville Properties.  *See* Ala. Code § 8-9A-8(b)(1).

constructive fraud claim brought under § 8-9A-4(c)(2).

ii.    Actual Fraud

Next, FCBH argues that the Transfer also constituted actual fraud under Ala. Code § 8-9A-4(a).  The Alabama Uniform Fraudulent Transfer Act provides that a transfer is fraudulent as to a creditor in the following circumstances:

> (a) A transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor.

Ala. Code § 8-9A-4(a).  "Actual fraud denotes the actual mental operation of intending to defeat or delay the rights of the creditor." *Cox v. Hughes*, 781 So.2d 197, 201 (Ala. 2000) (quoting *Granberry v. Johnson*, 491 So.2d 926, 928-29 (Ala.1986)). In determining "actual intent" to defraud under § 8-9A-4(a), courts <u>may</u> consider whether:

> (1) The transfer was to an insider;
>
> (2) The debtor retained possession or control of the property transferred after the transfer;
>
> (3) The transfer was disclosed or concealed;
>
> (4) Before the transfer was made the debtor had been sued or threatened with suit;
>
> (5) The transfer was of substantially all the debtor's assets;

33

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Ala. Code § 8-9A-4(b).

FCBH discusses each of the above-listed factors at length in its brief and presents unrebutted evidence as to a substantial majority of the factors.  (Doc. 87 at 17-19.)  First, the Transfer was made to an insider.  (Doc. 87, AF 23.1.)  Vakili retained possession and control of the property after the Transfer because he continued to receive rent payments on behalf of Faith Properties in his name after the Transfer in 2005.  (Doc. 89, Ex. 29 to K. Vakili Dep.)  Kevin Vakili attempted to conceal the Transfer by continuing to represent, even as late as April, 2005, to FCBH that he personally owned the Huntsville Properties.  (Doc. 87, AF 22.)  Regarding the fourth factor, Vakili was in the process of being sued before he made the Transfer.  (Doc. 87, AF 23.1.)  Fifth, as discussed *supra*, the Transfer depleted substantially all

of Kevin Vakili's assets.  Factor seven (the debtor absconded) does not weigh in favor of FCBH because Kevin Vakili had moved to Tennessee prior to the time that suit was filed.  Factor eight weighs in favor of FCBH since, as discussed *supra*, Kevin Vakili did not receive a reasonably equivalent value for the Transfer.  Factor nine weighs in favor of FCBH because, as discussed *supra*, Kevin Vakili became insolvent as a result of the Transfer and filed for bankruptcy shortly thereafter.  Factor ten does not weigh in favor of FCBH because the debt at issue was incurred long before the Transfer occurred, although judgment on those debts was entered shortly after the Transfer.  Finally, factor eleven is not applicable in the instant case.  (*See* Doc. 87 at 19.)  Although not every factor weighs in favor of FCBH, it is clear that the overwhelming majority of factors used to determine intent to defraud weigh in its favor.  Kevin Vakili makes much of the fact that these are factors which "may" be considered by a court in determining actual intent and implies that, because the Alabama legislature used the word "may," summary judgment is inappropriate (*see* Doc. 98 at 12), but the Court takes the use of this auxiliary verb only to indicate that the Court is not required to find that all of the factors weigh in favor of Defendants before finding that "actual intent" weighs in favor of FCBH.

Plaintiffs additionally cite to the fact that Kevin Vakili testified in his deposition that he made the Transfer, upon the advice of his CPA, for tax purposes

in 2003 (Doc. 98 at 12), and cites to the decision in *In re Earle*, 307 B.R. 276 (Bankr. S.D. Ala. 2002) to support his contention that genuine issues of material fact preclude the Court from entering summary judgment on behalf of FCBH.  In *In re Earle*, the court considered all of the factors in § 8-9A-4(b) and concluded that most of the factors weighed in favor of a finding that the debtor did <u>not</u> actually intend to hinder, delay, or defraud her creditors.  *Id.* at 293.  It then also looked to "other relevant evidence" and determined that this evidence <u>also</u> weighed in favor of a finding that the debtor <u>lacked</u> "actual intent" to defraud her creditors.  *Id.*  Accordingly, the Court entered a directed verdict in favor of the debtor as to the creditor's complaint to avoid fraudulent transfer.  *Id.* at 301.

Even drawing all <u>reasonable</u> inferences in favor of Kevin Vakili, FCBH is still entitled to summary judgment.  Regardless of what Kevin Vakili claims he <u>intended</u> in 2003, as discussed above, the operative date for determining actual intent is the date of recordation.   In December, 2005, the facts overwhelmingly indicate that Vakili's intention was fraudulent.

In addition to the above-described factors, other evidence in this case makes it unmistakably clear that Kevin Vakili had the actual intent, in December, 2005, to defraud his creditors. (*See* Doc 114, Exs. N,  O, P.)  In December, 2005, merely <u>days</u> before entry of the Default Judgment, Kevin Vakili instructed his attorney that he was

transferring the Huntsville Properties "to cover [himself] for any kinds of exposure". (Doc. 114, Ex. N.) He then arranged to transfer his interest in Faith Properties to his stepson, Jashfar, in order to further protect his assets from his creditors. (Doc. 114, Ex. O.) Kevin Vakili cannot contradict his own clear statements of intent in 2005 by arguing that, in 2003, he meant to transfer the Huntsville Properties to Faith Properties. Kevin Vakili's fraudulent intent is further demonstrated by the fact that he lied under oath during this litigation about his ownership of an interest in Faith Properties and about the fact that he was acting to transfer that interest to Jashfar in order to escape the reach of his creditors. (Doc. 114, Ex. O.) He also lied to FCBH in April, 2005, about his "sole ownership" of Faith Properties. (Doc. 87, AF 11, 12.) Additionally, taken in context with the emails he sent to his attorney, the preparation in March 2006 of unsigned 2004 and 2005 tax returns in the name of Faith Properties in no way contradicts the overwhelming evidence of his fraudulent intent in December, 2005. Finally, Kevin Vakili has demonstrated his fraudulent intent by admittedly violating the Alabama state court's injunction and selling his Ledges Residence and then transferring all of the net proceeds of that sale to his wife. (Doc. 87, AF 19-20.)

Taken together, there is no genuine issue of material fact to be determined as to whether, when the Transfer of the Huntsville Properties took place, Kevin Vakli

had the "actual intent" to defraud his creditors. He had such intent. Therefore, FCBH's motion for summary judgment is due to **GRANTED** regarding its actual fraud claim.

### iii.    Indemnification

FCBH has asserted a third party common law indemnity claim against Kevin Vakili. (Doc. 30 at ¶¶ 25-27). Under the common law of indemnity, "[a] person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity from the other . . . ." *Allstate Ins. Co. v. Amerisure Ins. Companies*, 603 So. 2d 961, 963 (Ala. 1992) (quoting Restatement of Restitution § 76 (1937)). FCBH has wholly failed to introduce evidence of any duty owed by Kevin Vakili that FCBH assumed on Kevin Vakili's behalf and FCBH has provided the Court with no analysis supporting its claim. Therefore, FCBH's Motion is **DENIED** as to this claim.

### 3.    The Stephenson Defendants' Counterclaims/Cross Claims[12]

### i.    Fraudulent Transfer: Actual Fraud and Constructive Fraud

The Stephenson Defendants have raised nearly identical arguments to FCBH in their motion for summary judgment on the counterclaims/cross claims brought

---

[12] The Stephenson Defendants' claims against Kevin Vakili for common law indemnification is **DENIED** for the same reasons as FCBH's common law indemnity claims.

against Plaintiffs and Kevin Vakili. (*See* Doc. 85 at 13-17.)  Similarly, Plaintiffs and Kevin Vakili have provided a nearly identical response in opposition to the Stephenson Defendants.  (Doc. 99 at 14-21.)  However, as Plaintiffs correctly note, only Providence is a proper "creditor" under the AUFTA because it is the entity that took assignment of FCBH's portion of the Default Judgment entered against Kevin Vakili.  *See* Ala. Code § 8-9A-1(4) (defining a "creditor" as "[a] person who has a claim.").  Therefore, summary judgment is due to be **GRANTED** in favor of Providence (only) as to both its constructive fraud[13] and its actual fraud counterclaim/cross claims.[14]  *See supra* at 27-37.

ii.     Plaintiffs' Standing

The Stephenson Defendants argue that Plaintiffs cannot claim any property rights in the Huntsville Properties because Marjan Vakili voluntarily conveyed her interest in the Huntsville Properties to Faith Properties in 2005 and because, under the fraudulent transfer act, Faith Properties did not receive any interest from Kevin Vakili, since the transfers from him were fraudulent.  (Doc. 85 at 19.)  Plaintiffs concede that Marjan Vakili no longer has any interest in the Huntsville Properties.

---

[13]  Unlike FCBH, the Stephenson Defendants did not raise at the hearing or in their brief a § 8-9A-4(c)(2) claim as part of their constructive fraud allegations.

[14]  Therefore the Court will **DISMISS WITH PREJUDICE** the fraudulent transfer claims of Charles Stephenson and Brookestone Place.

(Doc. 99 at 22 & n. 10.)  However, even having found that Kevin Vakili's Transfer was fraudulent, Marjan Vakili's transfer of her interest is not subject to the fraudulent transfer claims, because she was not a debtor of either the Stephenson Defendants or of FCBH regarding Kevin Vakili's liability on the Default Judgment. *See supra* at 25-26 (finding that Marjan Vakili's motion for summary is due to be granted). Therefore, although Marjan Vakili lacks standing to assert her claims, Faith Properties does not lack such standing because, while Kevin Vakili's interest is void as to it, *see* Ala. Code §§ 8-9A-4(a), 8-9A-5, Marjan Vakili's transfer of her interest in the Huntsville Properties is not void as to Faith Properties.  Thus, Faith Properties has standing to assert property rights in the Huntsville Properties but Marjan Vakili does not.

### iii.    Unclean Hands

Although not technically part of their counterclaims/cross claims, the Stephenson Defendants also assert that, by virtue of the fraudulent transfer between Plaintiffs and Kevin Vakili, Plaintiffs cannot recover on any of their claims that request equitable relief.  (Doc. 85 at 17-18.) This argument is raised as an affirmative defense.  (Doc. 41 at 19, Eighth Affirmative Defense.)  As such, the Stephenson Defendants have the burden to establish their entitlement to this defense. *See Tello v. Dean Witter Reynolds, Inc*., 410 F.3d 1275, 1292 (11th Cir.2005)

"[The Alabama Supreme Court] has recognized that one who seeks equity must do equity and one that comes into equity must come with clean hands." *J & M Bail Bonding Co. v. Hayes*, 748 So.2d 198,199 (Ala. 1999) (quoting *Levine v. Levine*, 80 So.2d 235, 237 (Ala. 1955)). "The purpose of the clean hands doctrine is to prevent a party from asserting his, her, or its rights under the law when that party's own wrongful conduct renders the assertion of such legal rights 'contrary to equity and good conscience." *Id.* (citing *Draughon v. General Fin. Credit Corp.*, 362 So.2d 880, 884 (Ala.1978). The application of the clean hands doctrine is a matter "peculiarly within the sound discretion of the trial court." *Lowe v. Lowe*, 466 So.2d 969 (Ala. Civ. App.1985).

"[T]he doctrine of unclean hands cannot be applied in the context of nebulous speculation or vague generalities; but rather it finds expression in specific acts of willful misconduct which is morally reprehensible as to known facts." *Retail Developers of Alabama, LLC v. East Gadsden Golf Club, Inc.*, 985 So.2d 924, 932 (Ala. 2007) (quoting *Sterling Oil of Oklahoma, Inc. v. Pack*, 287 So.2d 847, 864 (1973)). "We have held that the doctrine of unclean hands can be applied to a litigant if he has been guilty 'of unscrupulous practices, or overreaching, or has concealed important facts, even though not actually fraudulent, or been guilty of trickery, or taking undue advantage of his position, or other unconscientious conduct, then a

41

court of equity may deny relief, although such may not constitute a defense at law."

*San Ann Tobacco Co. v. Hamm*, 217 So.2d 803, 810 (Ala. 1965).  "[T]he doctrine of

unclean hands requires something more egregious than mere litigation strategy" or

"procedural maneuvering." *Hall v. North Montgomery Materials, LLC*, --- So.2d ----,

2008 WL 2410239 at * 17 (Ala. Civ. App. June 13, 2008).   "The misconduct which

falls within [the unclean-hands] maxim must have infected the cause of action, so that

to entertain it would be violative of conscience. It is not sufficient that the

wrongdoing is remotely or indirectly connected with the matter in controversy."

*Powell v. Mobile Cab & Baggage Co*., 83 So.2d 191, 194 (1955).

   The Court believes that Kevin Vakili's misconduct in the instant case  arises

to such a level that "to entertain it would be violative of the conscience."  83 So. 2d

at 194.  As discussed *supra*, Kevin Vakili willfully attempted to defraud his creditors

and this Court by claiming that the 2005 transfer of the Huntsville Properties was

done only to effectuate transfers that were intended to have occurred years earlier in

2003.  However, the evidence establishes that the 2005 Transfer was done to escape

Kevin Vakili's creditors. Further, Kevin Vakili, at the same time he transferred the

Huntsville Properties, divested his interest in Faith Properties, rendering the

transaction unreachable by his creditors.  Thus, Kevin Vakili is guilty of unclean

hands.

Marjan Vakili and Faith Properties are also guilty of unclean hands. It is undisputed that Marjan Vakili received proceeds from Kevin Vakili's sale of the Ledges Residence and used those proceeds to pay off only those debts of Kevin Vakili which Kevin Vakili directed her to pay and that, in doing so, she aided Kevin Vakili in avoiding FCBH, his judgment creditor, and in thwarting the Alabama state court's TRO. Further, Marjan Vakili participated in backdating to October, 2004, Kevin Vakili's December, 2005 transfer of his interest in Faith Properties to herself and her son. The emails from Kevin Vakili to his attorney establish that Kevin Vakili's transfer of all of his interest in Faith Properties to his wife and stepson was done for a fraudulent purpose. Thus, while Marjan Vakili is not guilty of unclean hands because of her relationship to Kevin Vakili alone, *see Helms v. Tullis*, 398 So. 2d 253, 254-255 (Ala. 1981), her own active misconduct in the instant case arises to the level of unclean hands. Faith Properties, as transferee of Huntsville Properties, is also guilty of unclean hands because the facts establish that Faith Properties was used as a type of sham organization to avoid Kevin Vakili's creditors and it was a central fixture in the fraudulent transfers discussed *infra* and the misconduct discussed in this section. Therefore, the doctrine of unclean hands applies to Kevin Vakili, Marjan Vakili, and Faith Properties. Plaintiffs are consequently barred from

seeking any equitable relief.[15]

### iv.    Set-off and Recoupment

The Stephenson Defendants also bring counterclaims for set-off and recoupment, claiming that "[t]o the extent, if any [Kevin] Vakili, Marjan Vakili, or Faith Properties are allowed to recover any rental payments from the Huntsville [P]roperties, any such amount must be subject to setoff and recoupment for the amount of the mortgage . . . ." (Doc. 64 at ¶ 41.)  This counterclaim is **DISMISSED AS MOOT** because, as discussed *infra*, all of Plaintiffs' claims are due to be dismissed and the Court finds that Plaintiffs are not entitled to any recovery.  A necessary element of setoff and recoupment is that Plaintiffs must recover <u>something</u> before those remedies are operative.  *See* C.J.S. Setoffs § 1 ("The fundamental philosophy of all set-offs and recoupments is that they are offered by a defendant in opposition to some money demand asserted by plaintiff.  They are procedural devices by which a defendant seeks to reduce the amount <u>he owes to a plaintiff</u> by the value of the plaintiff's cross-obligations to the defendant.") (emphasis added).  Since the Stephenson Defendants owe nothing to the Plaintiffs, there is nothing to offset.

---

[15]  Kevin Vakili would be barred from seeking equitable relief, but he does not seek any relief, whether legal or equitable.

**B.     Plaintiffs' Claims**

Plaintiffs' Amended Complaint (Doc. 13) includes twelve separate counts brought under Alabama law: accounting (Count I), breach of fiduciary care (Count II), conspiracy (Count III), money had and received (Count IV), wrongful foreclosure (Count V), conversion (Count VI), trespass (Count VII),   interference with contractual or business relations (Count VIII), abuse of process (Counts IX-X), invasion of privacy (Count XI), and outrage (Count XII).

1.     <u>Maples's Motion for Summary Judgment</u>

Plaintiffs bring claims against Maples for accounting, money had and received, and breach of fiduciary care.[16]  For reasons discussed below, the Court finds that Maples's Motion for Summary Judgment is due to be **GRANTED**.

Maples asserts that he is entitled to summary judgment on Plaintiffs' sole remaining claim for breach of fiduciary care (Count II). (Doc. 80 at 13.) As grounds for his argument, he asserts that, as auctioneer of the Huntsville Properties, he owed no duty of fiduciary care to the Plaintiffs, but only one of good faith and fairness. (*Id.*)

In their Amended Complaint (Doc. 13), Plaintiffs contend that Maples

---

[16]  At the hearing held on July 27, 2009, counsel for Plaintiffs stipulated that Plaintiffs' claims against Maples for accounting and money had and received were due to be dismissed. Therefore, Maples's motion is due to be **GRANTED** as to these claims.

breached three separate duties to Plaintiffs: (1) a duty to sell the Huntsville Properties as separate parcels, rather than an *en masse* sale, because any one of the parcels would have satisfied the entire debt; (2) a duty to remit the funds in excess of the secured debt; and (3) a duty to act in good faith in order to render the sale most beneficial to the mortgagor.  (*Id.* at ¶¶ 55-58.)[17]

Neither of the parties cite to any cases that define the duty of an <u>auctioneer</u> in conducting a foreclosure sale.  While Plaintiffs spend a significant portion of their Brief in Opposition explaining the duties owed to a mortgagor in a foreclosure sale (*see* Doc. 93 at 17-26), none of the cases cited therein discuss the duties of an <u>auctioneer</u> to a mortgagor.  Instead, these cases define the duty of a <u>mortgagee</u>.  *See, e.g.*, *Brabham v. American Nat. Bank of Union Springs,* 689 So.2d 82, 88 (Ala. Civ. App. 1996) (recognizing that a <u>mortgagee</u> owes a mortgagor a general duty of good faith and fair dealing and that a <u>mortgagee</u> is, "in a sense, a trustee")[18]; *Conway v. Andrews*, 236 So. 2d 687, 692 (Ala. 1970) (finding that foreclosure sale conducted

---

[17] Plaintiffs also argue in their <u>brief</u>, but not their Amended Complaint, that Maples had a duty to sell the properties for <u>cash</u>, to the highest bidder.  However, this claim was not raised in the Plaintiffs' Amended Complaint and therefore is not properly before the Court. A plaintiff may not raise a new legal claim for the first time at the summary judgment stage without amending the complaint, which Plaintiffs have not requested in the instant case. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312 (11th Cir. 2004).

[18] *Brabham* subsequently discusses liability of the auctioneer in that particular case, but it includes this discussion as an aside, after concluding that no fiduciary duty existed, and it contains no analysis as to whether an auctioneer owes a duty of good faith but merely assumes this point as a way of reaching a decision on the merits.  689 So. 2d at 89.

*en masse* should be set aside because the "mortgagee had thereby abused the trust duty owed to the mortgagor and his grantees.") (emphasis added); *J.H. Morris, Inc. v. Indian Hills, Inc.*, 212 So. 2d 831, 843 (Ala. 1968) (avoiding a sale when property was sold *en masse* because the mortgagee disregarded the rights of the mortgagor) (emphasis added); *De Moville v. Merchants & Farmers Bank of Greene County*, 170 So. 756, 754 (Ala. 1936) ("The mortgagee, in conducting the sale, represents the interest of himself and the mortgagor.") (emphasis added); *In re Sharpe*, 391 B.R. 117, 154 (N.D. Ala. 2008) ("In executing the power [of sale], the mortgagee becomes the trustee of the debtor, and is bound to act  bona fide, and to adopt all reasonable modes of proceeding in order to render the sale most beneficial to the debtor.") (emphasis added).  In the absence of any authority, the Court will not create *ex nihilo* a duty that an auctioneer owes a mortgagor in conducting a foreclosure sale.

Therefore, Maples's Motion for Summary Judgment is due to be **GRANTED** as to Plaintiffs' breach of fiduciary duty claims because Alabama law does not recognize a fiduciary duty that an auctioneer owes to a mortgagor in conducting a foreclosure sale.

### 2.   The Stephenson Defendants' Motion for Summary Judgment

Plaintiffs bring claims against the Stephenson Defendants for accounting, breach of fiduciary care, money had and received, wrongful foreclosure, conversion,

trespass, interference with business relations, abuse of process, and conspiracy.[19]  For reasons discussed below, the Court finds that the Stephenson Defendants' motion is due to be **GRANTED**.

> i.      Breach of Fiduciary Care[20]

Under Alabama law, the only duty owed in a foreclosure proceeding is owed by the mortgagee to the mortgagor.  *See Brabham*, 689 So. 2d at 88.  As Brookestone was the mortgagee in the foreclosure sale, Plaintiffs can only assert a claim for breach of fiduciary duty against Brookestone.  Therefore, both Stephenson and Providence are entitled to summary judgment on Count II.  Thus, the Court turns to the alleged duties breached by Brookestone.

In Plaintiffs' Amended Complaint, they contend that the Stephenson Defendants breached duties owed by a mortgagee to a mortgagor by (1) selling the Huntsville Properties *en masse* at the foreclosure sale, rather than parcel by parcel,

---

[19]  At the Court's hearing held on July 27, 2009, the Plaintiffs conceded that their claims for outrage, conversion, tortious interference with business relations, trespass, money had and received, and accounting against all Defendants are due to be dismissed  and that their claims for wrongful foreclosure, abuse of process, and breach of fiduciary care are due to be dismissed as to Charles Stephenson and Providence Place, LLC.  Therefore, the Stephenson Defendants' motion is due to be **GRANTED** as to each of these claims.

[20]  As discussed *supra* at 46, n. 17, Plaintiffs have argued in their brief that Brookestone violated a duty to sell the Properties to the highest bidder for cash rather than accept a credit bid, but Plaintiffs did not raise this claim in their Amended Complaint and so it is not properly before the Court.

(2) failing to remit alleged excess funds received in excess of secured debts to Plaintiffs, and (3) failing to act in good faith in conducting the foreclosure sale. (Doc. 13 at ¶¶ 55-57.)

First, the Stephenson Defendants claim that the foreclosure sale was properly conducted *en masse* because the Colonial Notes provided for an *en masse* sale. (Doc. 85 at 21-22.) This contention is incorrect. Only <u>one</u> of the Colonial Notes permitted an *en masse* sale. That note, signed in 2003, covered only one of the three Huntsville Properties (Tract 3, according to the first Colonial Note signed by Kevin and Marjan Vakili) and was signed <u>only</u> by Kevin Vakili. Thus, the Stephenson Defendants' assertion is simply not supported by the record as to the foreclosure of Tracts 1 and 2. Although the Colonial Notes contained cross-collateralization clauses (*see* Doc. 84, AF 37), only Kevin Vakili signed the 2003 note which provided for an *en masse* sale. The Stephenson Defendants cite no authority establishing that, by signing an additional note secured by one of the Huntsville Properties, Kevin Vakili waived Marjan Vakili's right to a parcel by parcel sale as to the other tracts. Therefore, the Court rejects this argument.

The right to a parcel-by-parcel sale in foreclosure proceeding is well-defined in Alabama law. Recently, the Alabama Court of Civil Appeals summarized this right and elaborated upon the duty of good faith in *Hawkins v. LaSalle Bank, National*

*Association*:

A mortgagee is, in a sense, a trustee for the mortgagor, and, in exercising the power of sale contained in the mortgage, the mortgagee must not disregard the rights of the mortgagor. The rule requiring that separate parcels be offered for sale separately arises out of the reasonable presumption, sanctioned by observation and experience, that property in distinct parcels, distinctly marked for separate and distinct enjoyment, will produce more when sold in parcels because the sale is thus accommodated to the probable wants of the purchasers. Of course, if such property is sold en masse and brings a fair price, the mortgagor will not be heard to complain. When a sale and purchase en masse are had under the power of sale contained in a mortgage, the mortgagor, if the purchaser acquires the property at a sum disproportionate to its real value, may, by seasonable action, have the sale annulled.

In a court of law, a power of sale is merely a part of a legal contract to be executed according to its terms. In a court of equity, it is quickened with the elements of a trust, and the donee of the power is charged as a quasi trustee with the duty of fairness and good faith in its execution to the end that the mortgagor's property may be disposed of to his pecuniary advantage in the satisfaction of his debt.

The reason for the rule requiring property covered by a mortgage or lien, which property is in separate parcels distinctly marked for separate and distinct enjoyment, to be first offered for sale in parcels rather than en masse, is that a sale in parcels or lots opens a field to a greater number of bidders, is conducive to a better price, tends to prevent odious speculation upon the distress of the debtor, and enables him to redeem some of the property without being compelled to redeem it all.

This rule applies where the property covered by the mortgage is separated into several distinct tracts or lots, either by natural boundaries, by the way in which it is platted or laid out, or by the fact that the parcels are not contiguous, and inures to the benefit of a party who has acquired rights in subordination to the

mortgage by a conveyance from the debtor.

In absence of statute, the effect of a sale under the power en masse, under circumstances where it is to the interest of mortgagor to have the property sold in separate parcels, is not to render the sale void, but irregular and voidable on direct attack by bill in equity filed by the mortgagor, who must show that the trust incident to the exercise of the power has been abused and that he has suffered detriment in the undue sacrifice of his property, or that his right of redemption has been unduly hampered.

--- So. 3d ----, 2009 WL 1495245 at *5-6 (Ala. Civ. App. May 29, 2009) (quotations and citations omitted.)  According to Plaintiffs, some of the very policy implications mentioned above were thwarted by the *en masse* sale of the Huntsville Properties. Specifically, Marjan Vakili was present and ready to bid on the Huntsville Properties and could have redeemed at least one of the Huntsville Properties, had they been sold according to the terms of the mortgage.  (Doc. 97 at 27.)  Thus, by conducting an *en masse* sale, Marjan Vakili was prevented from "redeem[ing] some of the property without being compelled to redeem it all."  *Hawkins*, 2009 WL 1495245 at * 6.

However, *Hawkins* clearly explains that a person who is harmed by actions such as those claimed by Plaintiffs have two possible remedies – breach of contract and wrongful foreclosure.  There is no separately recognized tort of breach of fiduciary care, standing alone.  Plaintiffs have not alleged breach of contract and have not sought any of the remedies sanctioned by *Hawkins*, which are the equitable remedy of having the sale annulled, or to bring an action for breach of contract.  *Id.*

Instead, Plaintiffs have sought tort remedies of compensatory and punitive damages against Brookestone regarding this claim.  (*See* Doc. 15 at ¶ 29.)  No case law suggests that either of the Plaintiffs can pursue tort remedies based on the *en masse* foreclosure sale rather than a parcel by parcel sale, or that any breach of the duty to act in good faith in conducting the foreclosure sale gives rise to a cause of action <u>for</u> <u>damages</u> in Alabama Courts.  Instead, Alabama law supports an equitable cause of action (as demonstrated *infra* by Faith Properties' wrongful foreclosure claim), or a cause of action for breach of contract.  Consequently, Brookestone is entitled to summary judgment as to this claim.

Finally, Brookestone claims that it did not breach a duty to remit excess funds arising from the foreclosure sale because there were no such surplus funds.  (Doc 83 at 23.)  Plaintiffs have declined to respond to this argument and therefore it is conceded.  *See, e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment); *Bute v. Schuller International, Inc.,* 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (finding unaddressed claim abandoned); *see also Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned); *Resolution Trust Corp. v. Dunmar*

*Corp.,* 43 F.3d 587, 599 (11th Cir. 1995); *Hudson v. Norfolk Southern Ry. Co.,* 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001); *cf. McMaster v. United States,* 177 F.3d 936, 940-41 (11th Cir. 1999) (claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's complaint); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.,* 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment").

Relatedly, the court is under no independent obligation to develop grounds in opposition to summary judgment on behalf of Plaintiffs regarding the potential viability of any claims as "the onus is upon the parties to formulate arguments[.]" *Dunmar*, 43 F.3d at 599 (citation omitted); *see also id.* ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.") (citation omitted)).

Consequently, Brookestone is entitled to summary judgment on this issue on the merits.

ii.     Wrongful Foreclosure

"[A] mortgagee cannot use the power of sale for purposes other than to secure the debt owed by the mortgagor. Any improper use of the power for such purposes

as oppressing the debtor, or serving the purposes of other individuals, will be considered by the court as a fraud in the exercise of the power. *Johnson v. Shirley*, 539 So.2d 165, 168 (Ala. 1988). "A mortgagor has a wrongful foreclosure action whenever a mortgagee uses the power of sale given under a mortgage for a purpose other than to secure the debt owed by the mortgagor."*Reeves v. Cedarhurst Devel. Corp.*, 607 So.2d 180, 182 (Ala. 1992) (citing *Johnson v. Shirley*, 539 So.2d 165, 168 (Ala.1989); *Paint Rock Properties v. Shewmake*, 393 So.2d 982, 984 (Ala.1981)). When a foreclosure complies with the terms of the mortgage, Alabama courts have entered summary judgment in favor of the mortgagee. *See Cornelius v. Bank Independent*, 647 So. 2d 715, 718 (Ala. 1994). The cause of action is an equitable one, brought against a mortgagee who goes outside the boundaries of the mortgage to foreclose for reasons not allowed by it. *In re Sharpe*, 391 B. R. 117, 152 (Bankr. N.D. Ala. 2008) (citing *Paint Rock Properties v. Shewmake*, 393 So.2d 982 (Ala.1981). ("If in any case it is attempted to pervert the power from its legitimate purpose and to use it for the purpose of oppressing the debtor or of enabling the creditor to acquire the property himself, a court of equity will enjoin a sale or will set it aside if made.").

Regarding Brookestone's argument against Plaintiffs' claim for wrongful foreclosure (Count V), Brookestone claims that it had no improper motive in

conducting the foreclosure sale.   (Doc. 85 at 26.)   But, taken in the light most favorable to the Plaintiffs, the facts indicate that Brookestone had the improper motive of seeking to acquire the property for itself rather than for the satisfaction of a debt obligation. (*See, e.g.*, Doc. 89, Maples Dep. at 16:10-13; 104:17-105:2.) Thus, Plaintiffs can state a claim as to wrongful foreclosure because they have proffered evidence which a reasonable jury could find supports the conclusion that the foreclosure sale was designed to provided the Stephenson Defendants with possession of the Huntsville Properties, rather than to satisfy Plaintiffs' obligations under the Colonial Notes.

However, as discussed *supra*, Plaintiffs are guilty of unclean hands as a result of their active participation in Kevin Vakili's attempts to evade his creditors.  As wrongful foreclosure is an equitable remedy, *see Harmon v. Dothan Nat. Bank*, 64 so. 621 (Ala. 1914), Plaintiffs are barred from obtaining equitable relief as to this claim. Therefore, summary judgment is due to be **GRANTED** as to Brookestone on the merits as to this claim.

### iii.    Abuse of Process

"The elements of the tort of abuse of process are 1) the existence of an ulterior purpose, 2) a wrongful use of process, and 3) malice." *C.C. & J., Inc. v. Hagood*, 711 So.2d 947, 950 (Ala.1998).  "When attempting to determine whether a plaintiff has

proven malice in an abuse of process case, the focus is 'not [on whether the defendant holds] ill will [against the plaintiff], or [is acting out of] spite, but rather, [whether] the [defendant] employed the process . . . for an end not germane thereto, for achievement of a benefit totally extraneous to or of a result not within its legitimate scope." *Shoney's, Inc. v. Barnett*, 773 So. 2d 1015, 1025 (Ala. Civ. App. 1999) (quoting Stuart M. Speiser, et al., *The American Law of Torts*, § 28:34, at 218 (1991)).

In this Count, Plaintiffs allege that the Stephenson Defendants "wrongfully initiated" the foreclosure process because at the time of foreclosure "the loan[s] were not in default, and any alleged default was for the ulterior motive of cutting off the rights of the Plaintiffs." (Doc. 15 at ¶¶ 101-102.) Plaintiffs admitted at the hearing the Colonial Bank Notes (secured by mortgages on the Huntsville Properties), which had been acquired by the Stephenson Defendants, were in default at the time of foreclosure. Therefore, this claim is due to be dismissed, on the merits, and Brookestone is entitled to Summary Judgment as to it.

iv.   Conspiracy

Finally, the Court turns to the Stephenson Defendants' argument as to Plaintiffs' claim for conspiracy (Count II). "In order to prove conspiracy, a plaintiff must allege and prove that the defendant . . . agreed with at least one other

coconspirator to accomplish an unlawful end . . . and intended to have that unlawful end brought about." *First Bank of Childersburg v. Florey*, 676 So. 2d 324, 327 (Ala. Civ. App. 1996) (citing *Eidson v. Olin Corp.*, 527 So.2d 1283 (Ala.1988)). "The essence of a conspiracy is an agreement, a meeting of the minds between the conspirators." *Id.* Further, "liability for civil conspiracy rests upon the existence of an underlying wrong and if the underlying wrong provides no cause of action, then neither does the conspiracy." *Jones v. BP Oil Co.*, 632 So.2d 435, 439 (Ala.1993). "Although civil liability for conspiracy may be established by circumstantial evidence, the evidence of the agreement [between coconspirators] must be sufficient to create more than suspicion or conjecture in order to justify submission to a jury." *Florey*, 676 So. 2d at 328 (quoting *Henderson v. LeBauer* 399 S.E.2d 142, 145 (N.C. App. 1991)). "The plaintiff must allege and prove that the claimed conspirators had actual knowledge of, and the intent to bring about, the object of the claimed conspiracy." *Id.*

Regarding their conspiracy claim, Plaintiffs allege that the Stephenson Defendants and FCBH "enter[ed] into a scheme to sell and purchase the Colonial Notes and Mortgages in furtherance of their scheme to take the Huntsville Properties and cut off the rights of the Plaintiffs to said properties." (Doc. 13 at ¶¶ 61-62.) The Court now scrutinizes these allegations to determine whether Plaintiffs have produced

evidence sufficient to withstand the Stephenson Defendants' motion for summary judgment.

Turning first to the element of agreement, Faith Properties[21] has not established that an agreement existed between the Stephenson Defendants and FCBH in this case. Although Plaintiffs describe in their brief that "[a]s amply demonstrated above, Stephenson and his companies, in concert with others, set about to accomplish an improper act," nothing in the evidence supports this contention.  (Doc. 97 at 28.) Plaintiffs have presented no evidence that the Stephenson Defendants conspired with FCBH to wrongfully foreclose on the Huntsville Properties.  Further, while it might be claimed that the evidence shows that Charles Stephenson, Providence, and Brookestone entered into an "agreement," this argument fails because Stephenson owned and controlled both Providence and Brookestone.  A person cannot conspire with himself.  *United States v. Arbane*, 446 F.3d 1223, 1231 (11th Cir. 2006) (citing 15A C.J.S. Conspiracy § 111 (2005)). In other words, as a matter of law, Stephenson could not conspire with himself to violate Faith Properties' rights.  Further, Faith Properties' own argument looks past the distinct corporate forms of Providence and Brookestone and asserts that Stephenson used the foreclosure process to procure the

---

[21]  Marjan Vakili concedes that she is not a proper plaintiff to the conspiracy claim (Count III).  (Doc. 97 at 28.)

property for himself.  (Doc. 97 at 28.)   Therefore, Plaintiffs' claim for conspiracy (Count III) fails as a matter of law.  The Stephenson Defendants' motion for summary judgment is due to be **GRANTED** as to this count.

### 3.    FCBH's Motion for Summary Judgment

Plaintiffs bring claims against FCBH for conspiracy, interference with contractual or business relations, abuse of process, invasion of privacy, and outrage.[22] For reasons discussed below, FCBH's motion is due to be **GRANTED**.

### i.    Conspiracy

As discussed *supra*, Plaintiffs claim that FCBH and the Stephenson Defendants entered into a scheme to obtain the Huntsville Properties by improper means (Count III). (*See* Doc. 13 at ¶¶ 60-64.)  However, as also discussed *supra*, Plaintiffs have not put forward any evidence that an agreement existed between the Stephenson Defendants and FCBH to reached an agreement to unlawfully foreclose on the Huntsville Properties.      To prevail on their claim for conspiracy, Plaintiffs  "must allege and prove that the claimed conspirators had actual knowledge of, and the intent to bring about, the object of the claimed conspiracy." *Florey*, 676 So. 2d at 328 (quoting *Henderson v. LeBauer*, 399 S.E.2d 142, 145 (N.C. App. 1991)).  Although

---

[22]  Plaintiffs conceded at the Court's hearing on July 27, 2009, that their claims for outrage and interference with contractual or business relations are due to be dismissed as to FCBH.  Accordingly FCBH's motion is due to be **GRANTED** as to these claims.

Plaintiffs have argued that counsel for FCBH knew that Charles Stephenson wanted to acquire the Huntsville Properties (*see* Doc. 98 at 15), there is no evidence that suggests that FCBH intended to assist Stephenson by foreclosing on the Huntsville Properties.   Any contrary conclusion would require the Court's speculation and, under the current facts of the case, such speculation is unwarranted.  *See Florey*, 676 So. 2d at 328.  Thus, FCBH's motion for summary judgment is due to be **GRANTED** as to Plaintiffs' conspiracy claim (Count III).

ii.      Abuse of Process and Invasion of Privacy[23]

Next, FCBH argues that Plaintiffs' abuse of process (Count X), invasion of privacy (Count XI), and outrage (Count XII)[24] claims are due to be dismissed.  (Doc. 87 at 28.)   According to Plaintiffs, FCBH wrongfully issued a trial subpoena to acquire the banking records of Marjan Vakili, after Kevin Vakili transferred to her the proceeds of the sale of the Ledges Residence in violation of the Alabama state court's order.  (*See* Doc. 13 at ¶¶ 104-116.)  Defendants contend that "there is no evidence whatsoever that the AmSouth Subpoena or any documents received in response [were] used in any wrongful or malicious way."

---

[23]   At the hearing, counsel for Plaintiffs conceded that these claims are asserted only on behalf of Marjan Vakili.

[24]   As stated previously, Plaintiffs have dropped their claim of outrage as to all Defendants, including FCBH.

"The elements of the tort of abuse of process are 1) the existence of an ulterior purpose, 2) a wrongful use of process, and 3) malice." *C.C. & J., Inc. v. Hagood*, 711 So.2d 947, 950 (Ala.1998).  '[T]he [ulterior motive] must culminate in an actual abuse of the process by perverting it to a use to obtain a result which the process was not intended by law to effect . . . . '" *Dempsey v. Denman*, 442 So.2d 63, 65 (Ala.1983) (quoting 72 C.J.S. Process § 120, pp. 1190-91 (1951)). "When attempting to determine whether a plaintiff has proven malice in an abuse of process case, the focus is 'not [on whether the defendant holds] ill will [against the plaintiff], or [is acting out of] spite, but rather, [whether] the [defendant] employed the process  . . . for an end not germane thereto, for achievement of a benefit totally extraneous to or of a result not within its legitimate scope." *Shoney's, Inc. v. Barnett*, 773 So. 2d 1015, 1025 (Ala. Civ. App. 1999) (quoting Stuart M. Speiser, et al., *The American Law of Torts*, § 28:34, at 218 (1991)).  A defendant cannot be held liable for abuse of process unless he or she "somehow acted outside the boundaries of legitimate procedure after [the initiation of the proceeding]." *Id.* at 951.

According to Plaintiffs, FCBH's attorney, Gibbons, wrongfully used a deposition notice under Ala. R. Civ. P. 30(b) rather than a subpoena duces tecum under Ala. R. Civ. P. 45 to obtain Marjan Vakili's banking records in order to avoid the 15 day notice provision in Ala. R. Civ. P. 45(a)(3).   (Doc. 98 at 18.)  In his

deposition, Gibbons admitted that he did not want to take Marjan Vakili's deposition

when he provided the notice and that he  "just wanted the documents[,] [s]o if they

produced the documents, I would cancel the deposition."  (Doc. 89, Gibbons Dep. at

69:2-21.)  While this testimony suggests that FCBH"acted outside the boundaries of

legitimate procedure," 773 So. 2d at 1025, in obtaining Marjan Vakili's banking

records, there is absolutely no evidence that FCBH "achiev[ed] . . . a benefit totally

extraneous to . . . its legitimate scope." 773 So.2d at 1025.  Therefore, FCBH's

Motion for Summary Judgment is due to be **GRANTED** as to Plaintiffs' abuse of

process claim.

Turning to Plaintiffs' related invasion of privacy claim, the Alabama Supreme

Court has "adopted the Restatement (Second) of Torts definition of the

wrongful-intrusion branch of the invasion-of-privacy tort:

> One who intentionally intrudes, physically or otherwise, upon the
> solitude or seclusion of another or his private affairs or concerns, is
> subject to liability to the other for invasion of his privacy, if the
> intrusion would be highly offensive to a reasonable person.

*Johnson v. Stewart*, 854 So. 2d 544, 547-548 (Ala. 2002).  "The wrongful intrusion

may be by physical intrusion into a place where the plaintiff has secluded himself, by

discovering the plaintiff's private affairs through wiretapping or eavesdropping, or by

some investigation into the plaintiff's private concerns, such as opening private mail

62

or examining a private bank account." *Id.* "[I]nvasion of privacy consists of four limited and distinct wrongs: (1) intruding into the plaintiff's physical solitude or seclusion; (2) giving publicity to private information about the plaintiff that violates ordinary decency; (3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; or (4) appropriating some element of the plaintiff's personality for a commercial use." *S.B. v. Saint James School*, 959 So. 2d 72, 90 (Ala. 2006). Plaintiffs allege FCBH committed the first sort of wrong in obtaining Marjan Vakili's banking records from AmSouth Bank. (Doc 98 at 19.) In support of their argument, they cite only to *Johnson v. Stewart*, a case in which the Alabama Supreme Court held that a private investigator's actions did not amount to an invasion of privacy when there was no evidence that the investigation had involved any private bank account records or private financial information. 854 So.2d at 550. Consequently, it does not prove that Plaintiffs are entitled to prevail on this claim. Plaintiffs cite no cases in which information, obtained pursuant to court-sanctioned discovery, was subject to an invasion of privacy claim. In fact, in *Ex parte A.B.*, 950 So. 2d 1142 (Ala. 2006), the Alabama Supreme Court expressly declined to suggest that engaging in "proper discovery efforts . . . represent[s] an invasion of privacy."

*Id.* at 1146.[25]   Although FCBH may have improperly used a deposition notice to obtain Marjan Vakili's banking records, there is no suggestion that Alabama law supports a cause of action for invasion of privacy for avoiding the notice provisions contained in Alabama's discovery rules.   Thus, since no cases suggest that FCBH's conduct during civil discovery amounts to an invasion of privacy, the Court finds that Plaintiffs cannot state a claim for invasion of privacy and, consequently, FCBH's Motion for Summary Judgment is due to be **GRANTED** as to this claim.

## V.   FCBH AND THE STEPHENSON DEFENDANTS' JOINT MOTION FOR SANCTIONS AND LEAVE TO AMEND

Finally, the Court turns to FCBH and the Stephenson Defendant's Joint Motion for Sanctions and Leave to Amend Their Counterclaims and Third Party Complaint (Doc. 116).   For reasons discussed below, the motion is due to be **GRANTED IN PART AND DENIED IN PART**.

Turning first to the aspect of the motion which seeks sanctions, FCBH and the Stephenson Defendants' joint motion calls upon the Court to exercise its inherent power to sanction the parties for bad faith misconduct in the litigation.   Recently, in

---

[25]   This statement is dicta, however, as *Ex parte A.B.* involved a discovery dispute involving efforts to obtain the name and address of the father of an out-of-wedlock child.   950 So. 2d at 1144.   Yet, it is noteworthy that in recognizing that the identify of a child's father involves legitimate privacy concerns, the Court did not believe that lawful discovery amounted to the tort of invasion of privacy.   *Id.* at 1146.

*Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298 (11th Cir. 2009), the Eleventh Circuit provided a succinct restatement of the rules limiting a district court's use of its inherent power:

> A court may impose sanctions for litigation misconduct under its inherent power. *Chambers*, 501 U.S. at 43-44, 111 S.Ct. 2123; *In re Sunshine Jr. Stores*, 456 F.3d at 1304. The court's inherent power derives from the court's need "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers*, 501 U.S. at 43, 111 S.Ct. 2123 (quotation marks and citation omitted). This power, however, "must be exercised with restraint and discretion." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980)."The key to unlocking a court's inherent power is a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir.1998).

*Id.* at 1307.  "A finding of bad faith is warranted where an attorney [or a client] knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." *Byrne v. Nezhat*, 261 F.3d 1075, 1121 (11th Cir. 2001).  The "[d]ismissal of a party's complaint or answer, or striking its defenses, as a sanction . . . is a heavy punishment," appropriate "only as a last resort, when less drastic sanctions would not ensure compliance with the court's orders." *In re Sunshine Jr. Stores*, 456 F.3d at 1305-06

At the hearing held on July 27, 2009, the movants conceded that the only

misconduct committed by Kevin Vakili, Marjan Vakili, and Faith Properties <u>during the pending lawsuit</u> was Kevin and Marjan Vakili's (Marjan Vakili testified as the 30(b)(6) deponent of Faith Properties) apparent misrepresentations under oath as to the backdating of and motivation underlying certain transfer documents.  Even assuming that they lied during their depositions, this type of misconduct does not rise to the level of severity that is sufficient to result in the ultimate sanction of entering judgment on all pending claims and counterclaims/cross claims in this case, nor is it sufficient for a lesser sanction such as a monetary penalty.  While the Court is troubled by Plaintiffs and Kevin Vakili's apparent misdeeds during the course of the joint movants' attempts to collect on debts owed by Kevin Vakili, none of that misconduct occurred <u>while this lawsuit was pending</u> and it would be inappropriate for this Court to sanction Plaintiffs and Kevin Vakili for misconduct relating to a separate proceeding in Alabama state court.  Therefore, this aspect of the motion is **DENIED**.

Finally, FCBH and the Stephenson Defendants seek leave to amend their counterclaims/cross claims to include claims for fraud and conspiracy, as well as include third party claims against Jashfar.  (Doc. 116 at 11, Exs. C-D.)  Under Rule 15(a)(2), Federal Rules of Civil Procedure, FCBH and the Stephenson Defendants may amend their counterclaims/cross claims only by leave of the court.  The Court

"should freely give leave when justice so requires." *Id.*; *see also McKinley v. Kaplan*, 177 F.3d 1253, 1255 (11th Cir. 1999) ("In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.-the leave sought should, as the rules require, be freely given.") (citations and quotations omitted). Justice requires that FCBH and the Stephenson Defendants be permitted to amend their pleadings. Plaintiffs' and Kevin Vakili's misconduct was unknown to FCBH and the Stephenson Defendants at the time they filed their initial or amended counterclaims/cross claims. They have requested leave to amend their pleadings a mere fourteen days after discovering, after a protracted discovery battle, the factual basis for their newly-asserted claims. The movants are guilty of no bad faith, undue delay, or dilatory motive in seeking leave to amend. Therefore, this aspect of the motion is due to be **GRANTED**.

However, upon the Court's review of the proposed amendments, the Court finds that the pleadings are disfavored shotgun pleadings. The Eleventh Circuit has addressed the issue of shotgun pleadings on several occasions and has warned of the problems that they can cause for district court judges. *See, e.g., Davis v. Coca-Cola Bottling Co.*, 516 F.3d 955, 979 n. 54 (11th Cir.2008) ("[S]ince 1985 we have

explicitly condemned shotgun pleadings upward of fifty times."); *Strategic Income Fund, LLC v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 n. 9 (11th Cir.2002) ("This court has addressed the topic of shotgun pleadings on numerous occasions in the past, often at great length and always with great dismay."); *Byrne v. Nezhat*, 261 F.3d 1075, 1131 (11th Cir.2001) ( "Shotgun pleadings, if tolerated, harm the court by impeding its ability to administer justice."); *Anderson v. District Bd. of Trs. of Central Fla. Cmty. Coll.*, 77 F.3d 364, 367 (11th Cir.1996) ("Experience teaches that, unless cases are pled clearly and precisely, issues are not joined, discovery is not controlled, the trial court's docket becomes unmanageable, the litigants suffer, and society loses confidence in the court's ability to administer justice").  In filing their amended counterclaims and third party complaint, the joint movants should take care to specify which defendants are subject to each of the claims and which factual assertions apply to which defendants.  Further, the amended pleading should not incorporate all previous allegations in each subsequent count. *See Byrne*, 261 F.3d at 1129.  Finally, because the joint movants seek to include allegations of fraud, they should be mindful of Rule 9(b) and plead the allegations of fraud with specificity, taking care to address each element of their fraud claim as to each defendant separately.

## VI.   CONCLUSION

For the reasons discussed in this Memorandum Opinion, the Court finds as follows:

1.   Defendant Stuart M. Maples's Motion for Summary Judgment (Doc. 79) is due to be **GRANTED**;

2.   Plaintiff Marjan Vakili's Motion for Summary Judgment (Doc. 82) is due to be **GRANTED**;

3.   Defendant First Commercial Bank of Huntsville's Motion for Summary Judgment (Doc. 86) is due to be **GRANTED IN PART AND DENIED IN PART**;

4.   Defendants Charles F. Stephenson, Brookestone Place, LLC and Providence Place, LLC's Motion for Summary Judgment (Doc. 84) is due to be **GRANTED IN PART AND DENIED IN PART**;

5.   Defendants First Commercial Bank of Huntsville, Charles F. Stephenson, Brookestone Place, LLC, and Providence Place, LLC's Joint Motion to Supplement Evidentiary Submissions (Doc. 114) is due to be **GRANTED**; and

6.   Defendants First Commercial Bank of Huntsville, Charles F. Stephenson, Brookestone Place, LLC, and Providence Place, LLC's

Joint Motion for Sanctions and Leave to Amend Their Counterclaims and Third Party Complaint (Doc. 116) is due to be **GRANTED IN PART AND DENIED IN PART**.

A separate Order will be entered.

**DONE** and **ORDERED** this the 13th day of August, 2009.

_____
**VIRGINIA EMERSON HOPKINS**
United States District Judge

70